May it please the Court, on behalf of the United States, the Government seeks a reversal of the District Court's order of an eight-level downward departure based upon family ties and cultural assimilation. Turning specifically to the cultural assimilation departure, as the Court knows, that is only a departure because it's an unmentioned factor in the guidelines that should be invoked. What does it mean here, exactly? I'm sorry? What does it mean here? I recall when the guidelines first came out, I recall it being used in the sense of somebody who comes from a country where all government conduct pretty much is corrupt. So some government official comes around to them and says, you have to do this or you have to do that. They offer a $20 bill and they get charged with bribery and they get a break because they didn't know any better in their culture. That's what you do. This is something different. And I don't understand exactly what cultural assimilation as a ground for departure means in this case. Well, it appears to me that based upon this Court's decision in Lipman, a case in which you had, as I recall, a defendant that was from Jamaica but had lived in this country, had come with his mother, had been here for maybe 20 years or so, had been in public schools. Where the person, if you actually sent them back to the other country, they wouldn't have the faintest idea what to do. That's right. No family there. So he tries to come back. And in that case, the District Court denied a departure. But this Court, as I understand it almost, it seems like dicta to me, suggesting that under certain circumstances that this sort of departure may be appropriate. And it's the government's view that this is exactly the kind of problem that Lipman has wrought, this case, where you have But we're bound by Lipman, aren't we? If it's made a holding that there is such a ground? Well, I think Lipman still really suggests that the basis would be if someone had, under that fact pattern, that there was some sort of really compelling reason why the person had tried to come back into the country based upon the fact that the person had been here for 20 years, his family was here. It's a very different factual circumstance than this circumstance in which the defendant comes back for what appears to be nothing other than economic reasons, does not have a spouse, does not have children here. And the key point that I think Lipman does make in terms of the threshold required for the District Court is that because this is an unmentioned factor, you won't find this Cultural assimilation isn't noted in the guidelines. It's not in the guidelines, but Lipman, I'm looking at Lipman in front of me, and Lipman says that it can be considered, or that it says it should be considered. And it gives us an example if cultural assimilation provided the motivation either for the illegal reentry or for continued presence in the U.S., that it may also be relevant to the character of a defendant besides another guideline. So why, is that off the track here for the judge to consider? If this is a basis for cultural assimilation, when the guidelines have said, this is a basis for departure, these facts, when the guidelines have specifically said the factor that is not mentioned, Chapter 1, Part 4AB, cited in Lipman, says this should only be invoked in a highly infrequent basis. Highly infrequent. Okay, so the judge here said, of all the cases I've had over seven years, this is the one case that jumps out at me that he viewed this defendant as standing out of all the others. I'm not saying whether it's right or wrong, but that's what he said. So assuming that he is entitled to make a judgment like that, you know, he's seen the defendants, he's talked to them, he's read the pre-sentence reports, he's reviewed what they were, any ancillary crimes they were charged with. They don't all come to him like this one, you know, where the guy's living a decent life and then as someone goes after him on his illegal re-entry, sometimes there are other crimes that are involved that bring someone to light. But in any event, he makes a judgment, this person is, of all the people I've seen in seven years, this is the greatest defendant I've ever seen. And I don't know if a judge can do that, but if he can do that, if he can make that type of comparison, why doesn't it come under the rule of Lippmann to say that, number one, it might be that the deep assimilation of this defendant into the community would affect his continued presence, although maybe it would be that he would be able to make a judgment about his character, which I guess is another, is that a specific separate guideline? Can't the judge consider the character of a defendant in sentencing? I suppose, I'm not aware of that particular guideline. That isn't something that's been briefed here. It's referring here to character under USSG section 21.1.2 or maybe, oh, 2L. It's 2L, yeah. I don't know if that's, I didn't remember the judge mentioning that here. No, it's certainly not invoked. In general, we would hope the judges would consider character when they sentence within a range. They can depart based on character. I hope that the Court looks at the full discussion, I'm sure you have, of all the various things that the judge said about this defendant. I see this case a little bit differently. The way I see it, the judge says he had this funny remark, he's a good citizen, even though he isn't a citizen. He's basically a fine fellow and somebody dropped a dime on him. However, he's not a citizen. And then we've got this Lipman case, and the question is, what do you do with, shall we call it a novel interpretation by the Ninth Circuit, which is nevertheless published? You have to follow it, unless you go en banc. If you're on a subsequent panel, that's the law, that we have to follow it. However, if it is a novel and surprising interpretation, we can distinguish or limit it, provided we could do so in an intellectually honest way. Is there an intellectually honest way that you think we can and should distinguish Lipman? Yeah. The intellectually honest way to do it in this case is to say the standard review that is now applicable in this case, given a downward departure, is the de novo standard review. I think it is de novo. I agree with you on that, because it's a procedural act. Because it's a protect act. And Chapter 1A, which ---- The act distinguishes Lipman. Well, I would say that ---- But all that does is it lets us review it de novo. It doesn't really mean that if you've managed to skate by the immigration officials, the way I understand Lipman, if you've managed to skate by the immigration officials for long enough, you have squatters' rights to stay in the U.S. Yeah, it's absurd. In this case ---- I didn't say that. The longer ---- The longer that this guy was able to stay in the country gave Ms. Harrison an opportunity to stay in the district court. Well, this is great, because he's eluded this ---- the officials for ten years. He's eluded the way to distinguish Lipman, assuming we're reviewing de novo. Lipman ---- even Lipman says that ---- and now with the de novo standard review, this Court gets to look back to all of those things that happened in the district court in terms of findings of fact. And this Court gets to say, is this the case, are these facts the case that allow us to say that under the guidelines, that a highly ---- in a circumstance where the guidelines, the Commission has said that it can only be invoked on a highly infrequent basis if it's an unmentioned factor, this isn't the case. Why isn't it the case that the judge says this is the one case in seven years? Because if you read that colloquy, what you're really ---- Well, I read everything the judge said, and frankly, I read it a couple of times because it's a difficult case in certain ways, you know. And that colloquy stands for the proposition ---- It's an appealing case on the equities. But a lot of these folks ---- Usually the way they get caught is they commit another crime. This fellow, somebody just dropped a dime on him. Well, and as I noted in my reply, there are things in the PSR that suggest that he hasn't been quite as law-abiding as the district court suggested. But this ---- the colloquy suggests the district court is really disturbed that someone who comes to this country illegally, albeit illegally, comes to this country and does a number of different things that we would expect of citizens. The fact that he's living the American dream in the court's view appeared to be something that suggested, therefore, I don't think that this is a serious crime. And that's not what Congress thinks. I don't think the judge was saying that because, look, the judge recognized that he had to be sentenced to prison. It's just a question of whether he could depart and make it shorter. The judge recognized he's going to be deported. And, in fact, he was deported, right? Immediately. Right. No prison at all. So, really, all the judge, it seems to me, was doing, and he said this expressly in his opinion. It's a question of whether the guidelines permit it. He said he didn't think the purposes of the criminal ---- of criminal law supported giving the guy a longer sentence because, you know, he didn't need to be rehabilitated. He was leading a decent life. And he didn't see any deterrent. He didn't see any deterrent effect of a longer sentence than six months. And, meanwhile, the guy's got a disabled wife and two kids. The record that I read said his wife couldn't work. And so, if you put him in jail longer, it's going to be harder on his family. Now, whether the judge, you know, traditionally, judges could consider stuff like that. Whether he can consider this and depart that far, I guess, is a hard question. But, as I understand it, we review, unless your colleague changes my view of it, I would say we have to review DeNovo because of the nature of the standard of review and that I don't view it as retroactive. But, second, that would affect whether he can depart. But then there's case law that says the extent of departure we review for abuse of discretion. Is that? That's correct. So we would make a threshold if we accept that Protect Act applies. We make a threshold determination. Can he depart on family ties? Can he depart on assimilation? If we end up saying yes, then as to the scope of the departure, we're in an abuse of discretion mode. That's correct. Okay. Let me ask, why does the government care about a case like this if the guy's gone? In other words, you want to have a resentencing so that, like, if he ever comes back, he would have to go to jail for another year or something? In this case, I think. So what's the government's incentive? Be 21 months if and when he comes back and we're able to resentence, assuming there is a remand in the case. That's certainly part of it. I think another part of it goes back to the question that, part of your question, and that is how does this sentence, you know, when you look at departure practice, I know this Court and the Commission ask you to try to harmonize what is in 3553A2, those purposes of punishment, with departure law. This is not a sentence that deters, provides general deterrence, that notion that a similarly situated offender would be aware of this particular proceeding. And this Court, the district court essentially converted a criminal case to a civil case. You know, this fellow was deportable the minute that the arrest was made, but we proceeded in a criminal case. In a criminal case, of course, the guidelines in this case, and particularly people with drug conviction, the Congress and the Commission believe that those sorts of folks should be incarcerated. So we don't get general deterrence. We don't promote respect for the law. So he was incarcerated. But what's the government's interest as to the length be more than six months now that he's been deported? In other words, if he wants to come back here, I'm just trying to understand why this is an issue for the government, that they would like to make the point that he should have had a longer sentence. Well, I think it's my responsibility. Is it for other people, or is it that you don't want this guy coming back? Well, I want to argue it's a number, it's a multitude of factors. A, I think I've got a responsibility to make sure that the provisions of the guidelines are enforced. And I don't believe that in this case, as in some other cases in the District of Montana where we've been hearing affirmative appeals, that the guidelines have been enforced. And we all understand there are places for departure, but they're going to be rare. This is not, in our view, a rare case. So we are worried about specific deterrence with this particular defendant. If he comes back, that will be the third time after two convictions, and we're going to want to make sure that we can get some more specific deterrence. But I think it is important to say all those other purposes that are set forth in 3553A2 are designed to achieve other goals, general deterrence, promoting respect for the law, and protecting the public. And the Congress clearly believes that this is the sort of person that should not be allowed to come back in here. We've got a person who's been deported because of a conviction based upon a drug trafficking offense. But the drug thing was, that was, wasn't that a long time ago? I don't think it was. I think he was. The time here that we're arguing about how much time he should do is being here. It's not the drug crime. Oh, no. The drug crime was what initiated the initial deportation. But it wasn't that long ago. I think it was in 92 or so. That's not the point. He did his time on the drug crime. Oh, absolutely. I'm not arguing about whether he gets more time on the drug crime. He did it legally, and he did time on that. Right. And I'm trying to figure out why the government is pressing it, whether you're just trying to get a, finally get a ruling from us, which you haven't gotten yet, on the PROTECT Act, applying retroactively. There are a bunch of cases stacked up, you know, that different ones have priority of submission, I guess. But is your incentive not relating to that, but to actually keeping this guy from coming back with his wife? If you look at the notice of appeal, the notice of appeal, although I will admit that the SG had not authorized appeal until after enactment of the PROTECT Act, but the notice of appeal was filed in this case before the enactment of the PROTECT Act. And that was done because of my view at the time that this constituted an abuse of discretion. So I don't want the Court to think that this is this case. I would make levels. If he, what if he departed downward and said one year instead of two years, as opposed to six months? In other words, what's the government's position of what would have been a just sentence given the nature of this defendant and what he was doing in his community? Right. Well, as the Court knows, I don't have independent authority to come before this Court with an affirmative appeal. The Solicitor General needs to authorize that. I can tell you that it's my own personal view that once you see a case go from zone D, a case, a zone of the guidelines which requires mandatory incarceration, right, anything at a criminal history one, offense level 13, mandatory incarceration for 12 to 18 months, no community confinement, no home arrest. It's BOP facility for a zone D sentence. And any time I see a sentence go from zone D to zone C or particularly zone D to zone B or zone D to zone A, I'm going to ask for an appeal. Unless we thought that the departure, unless we didn't object to the departure because we thought it was meritorious. But I think that the integrity of the system really is jeopardized when we have people who the commission believes, unless they're way outside the heartland, if the commission believes and the Congress believes that a term of incarceration is the appropriate remedy, that I believe that that, I have a responsibility to make sure that happens. Mr. Mercer, I have a practical question, and I've run into this before with other U.S. attorneys where the government has deported the individual after he served the short sentence. I don't understand how you can resentence this guy if he's not here. I mean, you've got a very practical problem. You can't, we can grant you relief in the form of telling Judge Malloy you've got to resentence him, but as a practical matter, until he comes back, you can't do it. I agree. And one of the reasons why I wanted to make sure the opening brief talked about whether, in fact, that issue mooted the appeal, I wanted to make sure that we set forth the law that suggested that this was not going to be moved. I don't think we think it's moved. But as a practical matter, doesn't it really mean that if we say that the court erred in the sentence, that this man and his wife, I'm assuming, although I don't know if his wife, does the record say whether his wife and daughters went down to Mexico? I don't believe there's anything in the record. Maybe Ms. Harrison will know. So whether they stayed here and they're hoping he can come back or whether they're down there with him and they all want to come back, if we reverse the sentence, doesn't it just mean that basically he can't apply to come back because he'd be a fool to come back and go back into jail? Well. As a practical matter, wouldn't it mean like he couldn't ask for permission? He could ask for permission. He could ask. He could go back and go to jail, but as a practical matter, he wouldn't. But he's not going to get permission anyway because now he's an aggravated felon, right, because of his prior drug trafficking? He could never come back. Well, I don't want to speak on behalf of the Immigration and Naturalization Service. Let's just say that the attorney general in his discretion is unlikely to exercise it in Mr. Gonzales's favor. But the last time he snuck in and didn't get caught for a long time. A long time. A long time. And I think the answer to the question you posed, Judge Gould, ties in with what Judge Tallman has asked, is I don't see this as different than if I'm hearing an affirmative case and you reverse and remand and we can't find the defendant. We're going to get an arrest warrant from the court and we're going to try to find him. This will put into place, if there's a reversal and remand here that requires resentencing, this will simply create a record that if, in fact, he comes back across the border, and I assume that he will, that we will, assuming we find him. If he came back illegally, he could be hit with another offense plus resentencing. Because supervised release triggers this anyway. I mean, he's got supervised release as a result of this judgment. That, you know, there's no departure that can affect that. And if the court wants me to, I think the term's three years here, but I wouldn't. We understand it's not moot. My question, I think, is more practical than any other. Although the last time I asked the question of the government counsel, the answer was, well, we could just sentence him in absentia, and that made absolutely no sense to me at all. No, and I'm not taking that position. I'm excited to hear it. One other question, Mr. Mercer, and that is with regard to our opinion in U.S. v. Leon on the family ties, aren't we also bound to follow that? Because here Judge Malloy made a finding that his wife's medical condition is such that she basically needs his care and support. But he's been deported, you know. So as a practical matter, he couldn't provide it even if. . . No, no, the record is once. . . The record does not support. . . In the government's view, the record supports nothing. And this is a classic example to say, well, his wife needs his support, and yet with full knowledge that the sentence is going to result in an immediate deportation, and he's going to be back in Mexico. The other thing, though, I'd like to say about Leon. One question on that, though, when you say with full knowledge. . . Didn't the deportation come afterwards? So at the time the judge sentenced, there at least would be the chance, there may not be a big chance that the Immigration and Naturalization Service then or now the Department of. . . Homeland Security. Homeland Security would just decide, oh, well, he's a good guy, we'll let him stay. No, because there was an INS hold on him, and so the minute that his term of incarceration was discharged, he was subject to that hold and would immediately be deported. Couldn't he apply for suspension or anything like that, you know, one of these remedies to get out? I don't think so. It's an aggravated felon. Yeah, he's an aggravated felon. Hopeless. And it's immediate. I mean, he's in our custody, and the minute that the BOP says the term is served, then Homeland Security is going to say, then he's deportable and he's gone. He goes from jail right onto the bus. Absolutely. Absolutely. But I'm just, I guess I'm thinking in theory the judge can sentence him as if he's not deported because he's not yet deported. But there is absolutely no chance that he can be reunited with that family pre-deportation  He can't provide the support and whatever the court had contemplated, because he got time served. He got six months, which he'd already been in, essentially. I think he might have been a few days short. The remainder of that time was gone. He's not eligible for, it used to be suspension. I guess he's holding a deportation. I think he's, isn't he statutorily ineligible now because of that prior conviction? Well, I think because, yeah, because it's a prior drug felony, I think that's right. Yeah. That's another twist. Yeah. So that's the thought on family ties. You're way over, so I should probably close it down unless my colleagues have other questions. Very helpful. Thank you, counsel. Thank you.     I have a question for Ms. Harrison. I'm looking forward to working more with Ms. Harrison. May it please the Court. My name is Melissa Harrison. I'm a professor of law at the University of Montana School of Law. I'm serving what? Go ahead. I'm temporarily serving as an assistant public defender in the District of Montana. I have a couple of questions for you. Lipman is a creative approach, and it is law of the circuit, which we must follow. However, there are a couple of factors in Lipman that strike me as offering a potential basis for distinction, and I want you to speak to them. Here they are. First of all, we said it was not reviewable in that case that the judge denied departure. The judge did not depart for Lipman. Second, Lipman attended New York public schools through high school. He was brought to this country as a child when he was 12 years old. And we said it is one thing to be returned to one's native land and quite another to be banished from the only real home country one has known. Your fellow came to the U.S. voluntarily rather than being brought by his mother, and he came at age 21 rather than age 12. So we can't really say that the United States is the only real home country he has ever known. He did not get brought here as a child and go to school here. I wonder if, especially when we consider that despite his even stronger equities, Lipman did not get his downward departure. I wonder if we should distinguish and limit Lipman to people who were brought here as children. In a word, no. As an explanation, I think it would – certainly there are facts which distinguish Lipman from this case. My client, and I have always represented this client, I was present at the sentencing. Mr. Mercer was not. The client first came to this country in 1979. Was he 21 or not? How old was he? He is in his mid-40s. So I think that's probably right. But he did come in 1979. This is page 35 that he was born in 1958. And it says in paragraph 38 that he lived in Socrates until approximately 1979 when he entered the United States. Yes. That's where I got to age 21. Is that right? That's right. Okay. He – my point being he wasn't brought here as a child. But I don't think that's a meaningful distinction. Why shouldn't we limit Lipman to people who have been brought here as children? Because – Here's what bothers me. Your fellow has great equities. My feeling is the same as the trial judge's. Gee, it looks like he's a good citizen except for not being a citizen. It's a real shame he can't stay here. But all these departures and all these failures to follow the sentencing guidelines and failure to sentence people, that's what stimulates Congress to pull up the ladder and impose mandatory minimums and prohibit departures altogether, require extraordinary recordkeeping for departures. It winds up being really short-sighted and mistaken to try to get around congressional intent. And your fellow, his equities look weaker to me than Lipman's. Your Honor, I would suggest that the reason not to limit Lipman to children is because that wasn't part of the Lipman court's analysis. Sure it is. The Lipman court's analysis – It's right here on page 729. Well, at 731, Your Honor – I quoted it to you. I'm sorry? I quoted it to you from page 729. But on 731, the Court says cultural assimilation may be relevant to sentencing if a district court finds that a defendant's unusual cultural ties rather than ordinary – Generalization. But every – in the common law tradition, cases grow out of facts. Courts don't get to write statutes. So you have to look at the facts to see what the case means. It also says on 731 that cultural assimilation may also be relevant to the character of a defendant sentenced under 2L1.2. And I simply think that there's no – Your Honor, aren't we dealing with the situation that motivated the Lipman panel? And that is, let's say a child is brought here, you know, in swaddling clothes by alien parents and is raised in U.S. schools, et cetera, and has no cultural ties whatsoever with the country of its birth. And we see – these cases are just heartbreaking. I mean, the INS wants to deport these people because now they've been caught, let's say, for a drug trafficking offense, back to a country that they don't know. Yes. And that, I think, is what Judge Preckerson was talking about in Lipman. We've all had those. I had that case. A kid adopted by American citizens from Haiti is a baby. And then when he's 25, he gets deported to Haiti. He doesn't know from Haiti. He doesn't speak the language. I would absolutely agree that that is a more compelling case. It is. So why shouldn't we limit Lipman to that? Lipman was that case. Because I don't – He was 12 years old. Lipman was a 12-year-old. But I think that there are other reasons, and that's why Lipman didn't – the court in Lipman didn't make that ruling that it was limited to children, because there can be other reasons. Cases don't get limited in the same case. They get limited in subsequent cases. That's the common law tradition. You say, in this case, such and such. And then a subsequent case says the first case is limited to facts like it had. But I would suggest, Your Honor, that that's not a reasonable limitation, because I think there are other – That's what I want you to explain. There are other situations, such as this one, where a cultural assimilation is appropriate. And here – Why isn't it a good limitation? I mean, you heard Judge Tallman's and, Judge, my hypothetical, actually real cases. Because it would exclude persons such as Mr. Rivas-Gonzalez. That's not an argument. That's just saying I want to win. No. I think it's saying that – Why shouldn't he be excluded? That's the question you have. Why shouldn't he be excluded? Because – and I'd like to start from the position that this wasn't just a cultural assimilation departure. It was an outside-the-heartland departure based on United States v. Parrish. And it – the judge found that this was the most extraordinary case that he had seen in seven years on the bench. And he found that this person was the most extraordinary person who'd been in front of him in seven years on the bench. The reason not to limit Lippman is that it would exclude and it would not allow a judge such as Judge Malloy in this case to find that an extraordinary individual could be granted a departure in this case. But the extraordinary factors, it seems to me, that motivated Judge Malloy were the This guy is legally married to a U.S. citizen-dependent spouse who clearly has serious medical problems. He's got two minor children that need to be supported. He's got a great job working construction on highway bridges. And he hasn't committed any other crimes except the one that got him deported the last time. And it seems to me the government's response to that is what we're really doing is rewarding this guy because he kept his head below radar cover and didn't get caught for a number of years, during which he did all these things, admittedly, while he was an illegal alien. He lived openly. Right. He wasn't trying to hide himself. Why is that a legitimate basis for cultural assimilation when he arrived here at age 22? Because that's not the only reason. Because the reasons Judge Malloy articulated were more than just cultural assimilation or into cultural assimilation goes the question of character. And if you want to know why Judge Malloy really departed, it was because of his character. And that is a part of cultural assimilation and family ties. And part of the problem is whenever you've got these deportation cases, the alien found in, the 1326 cases, a lot of them are the finest people.  And that is his finding. And that brings up, and I think this leads into the reason. We're not dealing with whether he can be deported. He's been deported. Right. The only question that was before Judge Malloy was how long should he be in jail. Right. And he served six months. He was in jail during. The question is, what are the grounds for departure? Why don't you assume we're going to look at them de novo? Do I have to? No. Yeah, assume that for my question. We may be able to argue the, you haven't addressed that issue yet. We'll give you time to address it. Please. We will. We'll address it in a brief report. It's an important issue. You don't waive anything. But what I would like you to hear is what are the grounds for departure. I've heard what your thought on cultural assimilation. I have one follow-up inquiry on that. And then I've got a question on family ties. On cultural assimilation, should we only apply Lipman where someone has an incentive to come back illegally, to reenter illegally because of their assimilation to the U.S. before they were deported? Or does it also apply where a man or a woman comes here without that incentive and after they're here they stay under the radar, to use Judge Talman's phrase, for a long time, become assimilated? Is that then a ground for a lower sentence under 1326? First, to answer your first question, I don't think it should be limited to people who re, Lipman should be limited to people who reenter because of their cultural ties. Which, by the way, was a factor that Judge Millay found. Mr. Rivas-Gonzalez has siblings who are legal who live in this country. And that was a factor mentioned by Judge Millay. Because Lipman, in fact, says the opposite. It says that and that's because the statute uses both phrases, that either they reenter illegally or they continue their presence. And in this case, the indictment charge that he was found in the United States. But what is the guideline? Is there any guideline? There's no guideline on this cultural assimilation. It's just what appears to be judge made. We do have to follow it. But should we, if the facts of Lipman were a case where the person had incentive to come back because of assimilation, should we extend it to a case where at least most of what Judge Millay was talking about was what happened after he came back? I think it wouldn't – I mean, even though the facts of Lipman are different in certain ways, but even though I know you know what Lipman says, and I quote from Lipman that it states that departure is permitted if unusual cultural ties provided the motivation for the defendant's, quote, continued presence in the United States, not reentry. Counsel, I get the feeling that you're elevating Lipman from a case by another panel at the same level as this panel to a statute to the United States Constitution. No, Your Honor. And it's just another case. And we have to look at the facts. And it is a binding case on this panel unless this Court decides to limit it. Okay. Let me ask you. I want you to have time to address two other important questions at least that are of interest to me. And we let Mr. Mercer go over time. I assume we'll give you what time you need. But I would like you to address the family ties issue and the argument made by Mr. Mercer that the whole idea that he needs a lower sentence because of his ties to his kids and his dependent wife who's disabled is out the window because he's going to be deported anyway. So he's not going to get out of jail and go back to support his wife. How do you respond to that? Does the fact of his imminent deportation render family ties irrelevant as a ground for departure? No. Because if that were the case, you would never have an illegal reentry case with family ties as a departure. And there are lots of them. But I think that in this case, family ties doesn't, I mean, even though Lopez refers to indispensable, obviously, you don't look at just in the future will the person be able to provide for his family. First of all, he is deported. He is deported and his family is still imbued. That's off the record, but I know that. Still in Montana. That's where her parents live, I assume, right? That's true. And if I might add something else off the record, I obtained for free an immigration lawyer to see about getting him back in this country, even though the chances are very bad. That is his wife's wish, and that's ongoing. So that's up to the Attorney General, right? Yes. And there was an INS detainer. That's why he was in jail, because given his character and his job and his family ties, he would not have been in jail pending this, except for the INS detainer. He just gave him credit for time served and then? No. He gave him a 6-month sentence and he served the entire 6-month sentence. He did not he was not immediately released that day. I see. Okay. He went back to jail until the 6-month sentence was served. It wasn't very long, because he'd been in jail almost 6 months up to that time.  I think it was about 2 weeks. 2 weeks. Now, Mr. Mercer has argued that, okay, you could have a case where someone's convicted of illegal reentry, and they're going to be deported, but they might get a suspension from deportation or they might be able to come get approval to come back, but not so here because he's got a drug crime. So he's going to be ineligible. He is. So there's no need for thinking about his family ties. So what's your answer to that? I have two answers. One is, even though it's extraordinarily difficult and practically, I mean, very hard, it is not impossible. And if you look at the sentencing transcript, Judge Malloy said you're probably going to get deported, but he wasn't deported yet. He wasn't deported until after he had served his sentence. And you don't even though it's highly, highly likely, you don't know. Is there a possibility, however, remote that he wouldn't be deported? And is there some statutory ground for what that avenue would have been? It would have been very hard to prevent his deportation at that time. But the problem now is he's excludable under, what is it, 8 U.S.C. 1252-843D or something? There are means by which that can happen. And this is off the record, but if you'll allow me, it's because I've been involved in getting him an immigration attorney. And you can certainly tell us if there's some statutory. What there is. I thought the only way he could get back was to sneak in. No. There is a legal way. And that is if his prior Washington. He'd exercise discretion. Oh, no. If his prior Washington conviction was expunged. Expunged. If he was pardoned of his prior Washington conviction. There's some chance of that. Yes. And that's the route we're going, quite frankly. Why don't you address, if you would, the PROTECT Act? You know, I'm just one member of the panel. And incidentally, there are other Ninth Circuit cases that have that same issue of retroactivity of, you know, when does it start to apply the standard. We don't necessarily have priority, but some panels have ducked the issue by saying it doesn't matter whether it's an abuse of discretion or de novo. We're going to do the same thing. So, you know, who knows? Perhaps we'll decide it in this case or perhaps a different case. But why shouldn't it be applied to him? Because it doesn't seem like it's dealing with a substantive right. Well, Your Honor, I would beg to differ. I think it does. And the problem and the reason I would ask this panel to not duck the issue is that I think it's important that to reverse a disturbing trend, which is to decide that this Act is retroactive. Counsel, we don't do trends. And I need an argument rather than just a statement of position. You said that you don't think the PROTECT Act is retroactive. But you didn't say why. The question that Judge Gould raised for you addresses, requires you to address why. My thought is the same as Judge Gould expressed. The PROTECT Act doesn't tell Rivas-Gonzalez how to behave. It tells us how to behave. It says don't review for abuse of discretion. Review de novo. That doesn't affect Rivas-Gonzalez's legal obligations at all. And as for trends, that's for newspaper op-ed writers. We don't do trends. Your Honor, my point was simply that there has not been the substantive analysis done, if you look at the prior cases which have held that it is retroactive. Tell me why it is not retroactive. Landscraft. Okay. Landscraft says I should look at whether it's procedural in the sense that it just tells courts what to do or whether it's substantive in the sense that it tells Rivas-Gonzalez what to do. Respectfully, Your Honor. Tell me why I'm wrong in thinking that it just tells us what to do. Respectfully, Your Honor, Landscraft starts with a presumption against retroactivity. That is the first step. And it's rebuttable. And then the second is you look at whether the statute evinces an intent to be applied retroactively. I am arguing that it does. I'm sorry, that it evinces an intent that it not be applied retroactively. What words are you relying on for that? I am relying on the section of the new legislation which requires the written explanation of reasons by the judge. And that is, it's found actually in the appellant's brief at the addendum, page 3. It's 3742. But, Ms. Garrison, we have those in the judgment and commitment order, do we not? And we also have them on the record of the sentencing here. We do here. But my point is that I'm making a statutory interpretation argument which said how could Congress have intended that on remand there has to be this written explanation if they intended it to be applied retroactively? It evinces an intent by Congress that it not be applied retroactively. We were to reverse, I suppose, if we were to find that the written reasons were to essentially articulate in writing the reasons that supported the sentence. You could. But in this case, there were reasons. But I'm simply referring to this as evidence of Congress' intent that it not be applied retroactively, because you can't apply it retroactively if there's not. I'm trying to see the substantive harm. The reason I asked you the question is that I've got a solution to that problem and it sounds like it's more procedural than substantive. We simply send it back to the sentencing court and say, now tell us why you did what you did. Well, let me address the substantive part, which I think is that this statute upsets the reasonable expectations of Mr. Gonzales at the time he was sentenced. And that is both of them. I'm not going to let you state it as fully as you can here. But you're not going to buy it? No, no. No, I'm not saying that. I haven't decided it. But I'll just tell you, the way it was framed in the brief, I didn't find it persuasive for this reason. Because Rivas-Gonzales doesn't know what the district court's going to do. But he does. Let's say the judge had departed the other way. It departed downward. I mean, it departed upward. And now we're reviewing an upward departure. Would he want us to review that for abuse of discretion? No, he'd want us to review that to normal. I just don't see how it really – I didn't see how you could show that defendants in 1326 prosecutions kind of universally would anticipate that the appellate court would review for abuse of discretion. But he does. And what you look at is his settled expectation at the time of sentencing. At the time of sentencing, what's very clear is that we presented an extraordinary factual sentencing. I mean, that's what it was. And to – I'll answer the question first. Is that – I had a thought. But is that – and at the time, I told Mr. Rivas-Gonzales, here's how this works, and we're going to put on these witnesses to talk about how great you are, and we're going to send all these letters, and we're going to have people make statements, and the judge is going to make a factual determination, and he's the one who gets to do that because he's the one who sees the witnesses, and the standard is abuse of discretion. And so, you know, a defendant is told, because maybe not in every case, but I think a good lawyer would explain what happens at sentencing and why we try to persuade the district court judge factually, and that the district court judge is in the best position to make that decision. Those are expectations that a defendant in Mr. Rivas-Gonzales' position had at that time. He also had a – But how is that different from a preliminary injunction hearing in a civil case where the district court makes findings of fact which are binding on us unless we can declare them clearly erroneous, but then we review de novo on the basis of those factual findings in applying the law to determine whether or not the district court abused its discretion in granting or denying the preliminary injunction? It's different, Your Honor, and it's different because this Court – I mean, there's a Ninth Circuit case law, and particularly on page 22 of the defendant's brief, that specifically states, and I quote from Murdishow v. Woodward, a 2001 Ninth Circuit case, "...taking discretion away from a sentencer violates the ex post facto clause." That is a quote. And that is the law that was – That context. That was in – Remember the factual context of that case? Not at the moment, I do not. I'm sorry. You realize it's not a statute. It's a case. It arises out of facts. That's absolutely right. The Johns case held the same thing, Your Honor. And – Arising out of facts. Absolutely. We've typically said that in parole cases where there used to be discretion to grant parole, and then the discretion to grant parole is taken away, and we say that that harshened – that made the punishment harsher because the person subject to the possibility of parole had previously had a possibility subject to the discretion of the parole board, and now he doesn't anymore. Your Honor, in Johns, that particular case was a guideline case. And the district judge could have reversed a guideline that took away the district judge's ability to depart downward based upon a finding, a youthful lack of guidance, even though that was ex post facto. You're trying to take ex post facto cases where the sentence becomes harsher as a result of a change of law and apply them to a changed standard of review, and I just find that a stretch. Your Honor, respectfully, I find it analogous. And the reasons are, in addition to a settled expectation at the time of sentencing on the – who would have discretion to sentence him, he also – the PROTECT Act also changes the procedure for on remand, and it changes the night – I'm looking at the PROTECT Act. I'm looking at 18 U.S.C. 3742, and I'm trying to find what there is in it that changes what the district court would do in a way that would amount to an ex post facto or retroactivity problem here. Yes. I can't find it. So you look at 3742 with me and point me to the correct subsection. It is – I'm looking at the actual statute. I have the actual statute, 3742, and it's the portion that requires the district court – Tell me the subsection so I can find it. I'm sorry. Sentencing upon remand, section G2A. Okay. I got G2A. On remand, the court shall not impose a sentence outside the applicable guideline range except upon a ground that A was specifically and affirmatively included in the written statement of reasons required by section 355.3c in connection with the previous sentence of the defendant prior to the appeal. That section, in effect, statutorily possibly, but it's in direct contribution to this Court's en banc ruling in United States v. Matthews. In Matthews, the en banc ruling of this Court was that on remand there is a completely open record. That changes the defendant's settled expectations because – I could see that in some factual context. If it narrowed the grounds on which the court could depart downward and the judge said, well, before the Protect Art Act, I would have departed downward, but now I can't, then I think your argument would be right based on that subsection. But I'm having trouble seeing how your argument can be right applied to this case where all you're talking about is the duty of the departing judge to give reasons for his departure. No, Your Honor. What I'm saying is that this violates the ex post facto clause and the due process clause because at the time of sentencing, Mr. Rivas-Gonzalez had the right at remand for the court to consider any factors on the – any factors at all. And in fact, if he was remanded – if this case were remanded and the Protect Act did not apply, the court could consider factors since the sentencing. And in this case, assuming Mr. Rivas-Gonzalez were brought back to this country or were ever back in this country and he was resentenced, there might have been intervening circumstances, clearly, in a case like this. Professor, the only thing that strikes me as odd about your argument is that we have always, since the sentencing guidelines were enacted in 1987, reviewed for abuse of discretion the district court's downward departures as we review their upward departures. And I don't see where this is anything new under the Protect Act. It's a higher standard, I guess, if you will. Right. But we are still reviewing the propriety of the district court's decision to depart downward a level. But it – respectfully, Your Honor, I think de novo is very different than abuse of discretion. It's not entirely different in this sense. I mean, there is some difference. But any mistake of law is an abuse of discretion. So that if the judge made a mistake categorizing something as a basis for departure, then clearly that's an abuse of discretion as well as an error under de novo review. That's true. The area is a valid basis for departure, but it's some question of degree or application. And it also – it applies to application of the facts to the law. And so the court is going to be looking at the facts de novo as well. And that brings up – this is the perfect case. We'd better quit, incidentally. We've gone a half hour, more than a half hour, in a 10-minute case just on your side. And all the arguments that are stated in the briefs are preserved. You don't waive something by not restating it orally. Unless my colleagues have further questions. No, but I do want to thank both counsel. Your arguments were very helpful. Yes. Thank you very much. And thank you for letting me answer those questions. I, for one, enjoy coming to Seattle. Great. Well, thank you. Thank you. I have one addition to the record that is a clarification on the site. I want the court to be advised that it appears that the First Circuit's decision in the United States v. Thurston, which was cited by Luis Gonzalez in his brief and cited by the government in its reply, appears to have been withdrawn. Yeah, we checked that out. And I guess – I think we were told by the clerk's office at the First Circuit that when they're considering making an in-bank call on a case that they sometimes withdraw their opinions from publication, the answer made no sense to me because it's not – you know, in the Ninth Circuit, we don't do it until we actually vote to go en banc. So I guess the question that it raises in my mind is what precedential value, if any, does that opinion still carry if it's been withdrawn from publication? Well, the government's view of that position is that in my 28-J letter from last month, I cite a case called the United States v. Frazier, another First Circuit case, which considered whether the Dano standard review applied to an upward departure. And the court, in the government's view, says – it's our view that the standard review is applicable to both upward and downward departure. So I think although Thurston's effect may be – the analysis of Thurston may be the effect that the First Circuit still appears to be on record with the position set forth. Thank you, counsel. No, I think we've got to close it down at some point, unless my colleagues want to hear more. No, this is great. I think both counsel would be commended for their excellent arguments. They both get an A-plus under either discretion or denouement. Thank you. Professor, say hello to EQ for me, will you? All right. Thank you, counsel. Revis Gonzales is submitted. Do you want to recess before Snigdra? Sure. We'll take a 10-minute recess. All right. This court stands in recess for 10 minutes. Recess is adjourned.
judges: Kleinfeld, Gould, Tallman